## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

JACK STONE,

        Plaintiff,

      vs.

UNITED STATES DEPARTMENT
OF STATE CA/OCS/CI, AND
U.S. EMBASSY TOKYO,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

Case: 1:21-cv-03244
Assigned To : Unassigned
Assign. Date : 12/6/2021
Description: Pro Se Gen. Civ. (F-DECK)

Related Case No. CV 19-3273

RECEIVED
Mail Room

DEC - 6 2021

Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

### I.

### Emergency Motion for Passport Issuance Due
### November 1st 2021 Reabduction of Plaintiff's Minor Child

### II.

### Motion for Wife's Visa Issuance Due Defendant
### Failing to Provide Access to Online Form and
### Failing to Schedule Final Interview

### III.

### Motion for CRBA and Social Security Card Issuance to Plaintiff's Second
### Child Who is Currently in a State of Abduction and Due Final Agency
### Action and Denial of Issuance Due Child Not Able to Appear at
### Tokyo Embassy and Defendant's Refusal to Waive Appearance

I.

Passport

1.    This Court being fully advised Plaintiff's wife was a flight risk due initial abduction into Japan, on November 1st 2021, reabducted Plaintiff's firstborn child, and, along with the second child has disappeared. The wife's family claims they do not know where she or the children are located.

2.    The wife has been unemployed for eight years and was not in a financial position to care for herself or the two children. This means the reabduction could not have been carried out without financial support and without being aided by others.

3.    The children are currently being held at an undisclosed location and since November 1st 2021, the wife has not responded to email, telephone calls or FaceTime video.

Exhibit A is a true and correct copy of a short note Plaintiff's wife left on November 1st 2021.

4.    The message is clear. The wife reabducted the first child and has gone into hiding with both of Plaintiff's children. The note claims the wife no longer resides in Yonezawa, where she has resided for the past three years after wrongful removal of the oldest child from the state of Florida where the family habitually resided. The note also states she will "raise [her] two sons."

5.    This occurred after the Japanese court dismissed the wife's attempt at obtaining temporary and sole parental custody.

6.    As well, custody proceedings are currently underway in the state of Florida. In that matter, November 10th 2021 the court gave the wife 20 days to respond to Plaintiff's custody demand. The wife has not participated in any of the Florida proceedings and has ignored all of that court's orders and notices.

7.    Prior to this recent third reabduction after the initial abduction into Japan, Plaintiff scheduled an appointment with Defendants to secure passport for his child. This was necessary as Plaintiff's visa was set to expire again October 27th 2021 and suffering, fear, and conditions of instability could not be tolerated any longer.

8.    Exhibit B is one of the last photographs Plaintiff took of his child. They had gone to Tokyo to support Vincent Fichot in his hunger strike. Fichot set himself up at the entrance to the Olympic Stadium and was already on day 21 of his hunger strike.

9.    Hundreds of parents similarly situated as Fichot and Plaintiff traveled to Tokyo from the far corners of Japan and from numerous nations in support of Fichot's efforts. They carried posters of their children and interviewed with the MSM, as they hadn't seen their children since abduction, some for months, others for 15 years or longer.

10.    Fichot's hunger strike overshadowed Japan's summer Olympics, and was covered by the media more than the Olympics itself.

11.    Fichot hadn't seen his two sons in more than three years and resorted to the hunger strike because Japanese officials would not aid in the matter.

12.    Plaintiff now has two sons in same state of abduction as Fichot and this is more ominous than can be put in words.

13.    After Plaintiff departed Tokyo to return to Sendai, Fichot fainted and shattered several bones in his arm. However, he was so weak he could not be put on anesthesia for doctor's to operate on the arm. Plaintiffs child is fully aware he was abducted into Japan.

14. The child is currently fully aware he has been reabducted, would be frightened and confused and want to have contact with Plaintiff, who is the only person the child has lived with over the course of the past three years, a matter this Court is aware of.

15. The child wanted nothing more than to leave Japan and return to the U.S. and end the cycle of court involvement in his life.

16. The child cannot communicate in Japanese.

17. The child knew Plaintiff was involved in a dozen courts trying to get him returned home. The child spoke at a human rights conference in June of 2019 to approximately 1000 world delegates about being abducted into Japan. The child provided to court after court, deposition statements about how much he wanted to leave Japan and return to the U.S.

18. Although Plaintiff has taught the child how to use the toilet, bath himself, use a toothbrush, eat with utensils, change his clothes, type, water color paint, ride a bicycle, swim, surf and skateboard, the child has disappeared into Japan's abduction blackhole.

19. Defendants knew or should have known this was going to happen.

20. Plaintiff taught his child how to prepare his own meals, how to play piano and string instruments, to master music theory, and taught the child to read at an advanced level, to study math, science, history, grammar and the arts several years advanced children his age. Yet, Plaintiff was unable to do what was most important, get the child safely out of Japan and to a stable environment where the child didn't have to fear the reality that he and Plaintiff now face.

21. Of all the things Plaintiff taught the child, he failed to set up an email account for the child and failed to teach the child how to use email to contact his father and tell the father where he is located. Had Plaintiff done that, there is no doubt the child would have contacted his father by now and told where he was located.

22. Exhibit C is a true and correct copy of the appointment Plaintiff had scheduled for passport reissuance, November 15th 2021, where he was to address CFR 2012 Title 22 Vol.1 §51-28,8 FAM 502.5-2e(4), 8 FAM 502.5-3d(4) and 8 FAM 502.5-3d(8). This exhibit includes Defendants response to scheduling this appointment for passport reissuance, which shows Defendant demanded both parents appear and apply at the embassy, despite the ongoing exigency.

23. With all the case history, and this Court's ruling, and without permitting Plaintiff to argue why passport must reissue, Defendants continue to demand both parents appear at the embassy and continue to demand the abductor mother consent to passport issuance, even where it was the abductor mother who admitted to Defendants January 4th 2019

that she destroyed the child's passport after bringing the child into Japan in violation of the Hague Convention and in violation of Plaintiff's parental rights.

24.    As it had been three years since the wife failed to sustain the family, that Plaintiff's visa was set to expire again, and that the child had been stranded in Japan for the past three years, and, where this Court held in its DE160 Memorandum and Opinion that Plaintiff should reapply for passport, and where Defendant counsel had already communicated passport would reissue, and at the time of this Court's DE160 order, Defendant's counsel had been negotiating reissuance of passport in good faith, Plaintiff scheduled the appointment for purposes of getting the passport reissued. Even so, Defendant being fully aware of said facts, and that the child had been reabducted, sent an email November 5th stating the following:

25.    "Per the information available on our website (https://jp.usembassy.gov/passports/children-under-16-first-time-and-renewal/), applicants must appear in person, accompanied by both parents…"

26.    Defendants' communication goes on to state:

27.    "Both parents must authorize the issuance of the child's passport. The best way to do this is for both parents to go with the child in person to apply for the passport."

28.    As well, "As previously discussed, you may wish to seek legal advice from an attorney in Japan for information on custody issues and domestic abduction issues."

29.    Fully aware Plaintiff's child has been reabducted and fully aware this Court ordered Plaintiff should reapply for passport, the same rhetoric that had gone on prior to the Court's order and prior to DOJ counsel having already stated passport would reissue if Plaintiff went to the embassy and reapplied, continues, even in the face of reabduction.

30.    At what point does agency action become arbitrary? If not after reabduction, when? If not after initial abduction into a nation Defendants condemn as a Hague Convention noncompliant nation, when? At what point would passport reissue where Defendants have repeatedly issued demarche after demarche to Japanese authorities demanding abductions into Japan cease? At what point would passport reissue after Congress holds Japan noncompliant to the Hague Convention and the Goldman Act? At what point does a passport reissue after Defendants place Japan on its 2021 Report on Human Trafficking as a major human trafficking nation, and, that Japan is a nation that lacks the political will to remedy child trafficking? At what point does passport reissue after a child disappears into the abduction blackhole Japan is notorious for being and condemned by the entire European Parliament, which voted 33-0 to sanction Japan in June of 2020? At what point does passport reissue, only if a child is brought back home in a casket? After a child has been abducted so long that he has no longer has memory of the parent who

fought for three years to protect him? At what point is Defendants' actions arbitrary, capricious and abusive?

31.    As this Court is aware, despite Defendants repeated and false claims that a passport will not issue without two parent consent, CFR 2012 Title 22 Vol.1 §51-28,8 FAM

32.  502.5-2e(4), 8 FAM 502.5-3d(4) and 8 FAM 502.5-3d(8) permit passport issuance without two parent consent. Passport may also issue through judicial order without two parent consent, due exigency, special family circumstances, or where a child is brought into a foreign country and stranded which applies herein as the mother/abductor is the person who destroyed the passport for purposes of stranding the child into the foreign country, and for abandonment as the mother had little contact over a three year period prior to reabduction, and to avoid endangering the health, safety and welfare of a child, and where one of the parents is not sustaining the family as has been the case regarding the mother for the past three years, or where the non-applying parent is not providing the family with the means to sustain itself, again relevant matters.

33.    The Defendants refused to reissue passport as far back as February of 2019. This Court held it could not address damages that occurred after the date of filing and the mountain of damages that ensued thereafter assuredly should result in this Court compelling passport issuance.

34.    In refusing to reissue passport Defendant claimed "The child [was] in no immediate danger." Yet, the child was repeatedly reabducted and it took attorneys and police in two prefectures to coordinate the return the child to Plaintiff each time. How the Defendants can argue abduction and repeated abductions doesn't endanger a child is something yet to be addressed.

35.    The U.S. Supreme Court holds abduction is the worst form of child abuse. See: Abbott. The European Parliament in June of 2020 voted 33-0, holds abduction is the worst form of child abuse and spousal abuse, and condemns Japan for the more than 150,000 children currently abducted into Japan, in that 33-0 vote.

36.    Now, the child Plaintiff stood by for three years and tried to get returned to the U.S. has disappeared into Japan's blackhole. This happened because Defendants were not personally affected by the situation, were indifferent, failed to use the applicable 8 FAM analysis, and didn't like being sued by Plaintiff. These are not Plaintiff's words. These are the words of the Defendants, preserved in the administrative record. Passport didn't issue because that is what Defendants "usually did" and there certainly can't be more of an arbitrary reason to not reissue passport to an abducted child then that is what Defendants usually did.

37.     According to Defendants they refused to reissue passport in February of 2019 because Plaintiff was the sole provider for the child. However, Plaintiff's visa for the past three years was no better than a tourist visa which did not permit Plaintiff to obtain employment, and this Court permitted an employment contract valued at more than 160,00.00 USD slip away, where the Court could have compelled passport issuance on financial grounds which would have moved the child from instability and put Plaintiff is a financial situation where he could be currently employed and currently protecting the child and having some semblance of a normal and stable life.

38.     Instead, Plaintiff had to rely on public assistance in a foreign country, issued due dire circumstances, even where Japan's Supreme Court held public assistance is not permitted for foreigners. The situation being so grievous that the foreign government provided protection money anyway in violation of that nation's Supreme Court ruling. As well, the city housing office provided housing to prevent the child from being homeless in the foreign country. Why? Because the child's mother who had nearly no contact for three years refused to be guarantor on the child's housing, and where foreigners cannot obtain housing in Japan without a Japanese guarantor. In that matter, Plaintiff and child faced court order eviction in Sendai District Court, which was resolved by city officials to prevent the child from becoming homeless because the city provided housing as legal proceeding ensued, even where Japan's Supreme Court did not permit it.

39.     Plaintiff successfully appealed at Florida's Second District Court of Appeals (2DCA) over jurisdiction that pertained to custody and habitual residency of the child. The 2DCA reversed and remanded and that matter is currently ongoing with no sign the custody dispute will be resolved any time soon. Even if it was, Japan generally ignores foreign custody orders.

40.     The abduction matter now is so dire, November 2nd 2021, Sendai Bar Association and the International Bar Association appointed committee members to represent Plaintiff to aid in locating his abducted children. Currently, these attorneys are preparing to file in Sendai Family Court an emergency return order for the child to be turned back over to the Plaintiff and for habeas corpus relief. Yet, the children and the mother's whereabouts remain unknown and this affects notice requirements.

41.     Under  8 FAM 502.5-3d(8), passport must reissue if one parent confiscates the U.S. passport of a minor, effectively stranding the U.S. citizen abroad. Defendant are well aware the child was stranded abroad as the mother admitted this at a January 4th 2019 interview with U.S. Tokyo Embassy consulates. This too is preserved in the administrative record.

42.     There exists no reason passport should not issue, yet Defendant continues to persist in demanding both parents appear at the embassy and both parents consent, even where they are fully aware the mother has disappeared into the blackhole Japan is condemned for, by the Defendants themselves and condemned as a major child trafficking nation, by Defendants as well.

43.     It's time to put this passport issue to rest, as Defendants and the mother are exclusively responsible for the current reabduction situation which would not have occurred had passport reissued at any time prior to the November 1st 2021 reabduction, the day both of Plaintiff's children disappeared without a trace.

44.     If passport is ordered reissued the child would forever be removed from Japan, and forever be removed from the continuous threat of reabduction and returned to a stable life, and be given the opportunity to heal from this trauma.

45.     This Court was aware Plaintiff was in a state of terror for three years, and often that terror carried over into filings, and, that the terror was due the underlying uneasy knowledge that if the child would not be removed from Japan, eventually reabduction was going to occur and has. This Court cannot pretend this was not repeatedly communicated to the Court or that it failed to recognize Plaintiff suffered psychologically from three years of being imprisoned in Japan and he and his child being wrongfully retained in the foreign nation under hostage-like conditions.

46.     If the child is located, Plaintiff must be permitted the right to have passport ready at hand and use it to protect the child and remove the child from the three years of hell that continues, as instability and uncertainty mounts.

47.     All the legal jargon, the magic words such as irreparable psychological, emotional and developmental harm and that this matter affects the children's health, safety and wellbeing presented to Defendants and the Court by leading experts are all applicable.

48.     Plaintiff's child is fully aware he is currently reabducted. The child has resided with Plaintiff for three years. The mother abandoned him long ago, and had barely any contact during that time. The child has no memory of ever residing with the mother as he was four-years-old when Plaintiff located him, after being hidden for two months at an undisclosed location as far back as November of 2018. Now the child is nearly eight. All of the child's favorite things have been left behind, including "Blue Bear" and "Monkey Owl" two stuffed animals that were the first two gifts Plaintiff gave the child after birth. The child has slept with these stuffed animals as security blankets everyday of his life. But no longer now, as they remain in the child's bedroom at Plaintiff's current dwelling place with all of the other important property the child holds dear.

49.     Blue Bear and Monkey Owl were the only things the child was able to get out of the mother's parents' home January 2nd 2019 when Plaintiff discovered the child in conditions of abuse and neglect and took physical custody thereof.

50.     Exhibit D are photographs of the child, taken January 2nd 2019, after leaving the mother's parents' home. These photographs show the child left the home in an emotional state and had to use his slippers for gloves because the mother would not turn over the child's winter clothing or any other of his belongings. These photographs also show the child in stable condition after being traumatized at the mother's parents' home during extraction. These photographs include the child on a train bound for Sendai, Japan. These photographs show stability on the train where Plaintiff was homeless, but provided a room in an office building by a single parent father who had won custody of his child in Sendai Family Court, an ultra rare event.

51.     That this matter has been permitted to drag on by Defendants until the child has been reabducted and his whereabout unknown is so appalling there is yet to be a word created in the English language to express such loathsomeness.

52.     It is long overdue that this Court remedy this appalling wrong and ORDER passport reissue.

53.     Finally, November 15th 2021, Defendants recognized exigency and sent an email to Plaintiff stating they were going to attempt to schedule a child welfare check. This alone should result in the Court compelling passport issuance or Defendants doing so voluntarily.

54.     For the foregoing and under the same analysis, Plaintiff demands passport issue to his youngest child who is also currently in an abducted state, where the mother has stated she will raise the children alone, despite being financially unable to do so, and where custody proceedings are underway in Florida, and where she has ceased in communicating with Plaintiff and has not complied with any Florida court orders.

55.     Exhibit E is a true and correct copy of Defendants' November 15th 2021 communication that the embassy will finally "attempt" to do a child welfare check. This exhibits also shows Plaintiff's current counsel in Japan, attorney Yusuke Ube's communicated that he contacted Plaintiffs wife and her parents, and that the wife is not responding to any calls and that the parents are falsely claiming they do not know where the wife or children are located.

56.     Importantly, the wife has been unemployed since November of 2013, eight years, and is incapable of financially providing for the children or herself for that matter.

n.

Wife's Visa

57.     This Court held in its DE160 Memorandum and Opinion the following:

58.     The Government's position appears to be that it could indefinitely avoid judicial review of its actions here by postponing a "formal" decision, which strikes the Court as untenable. *See Envtl. Def. Fund*, 428 F.2d at 1099 ("[W]hen administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief."). Mr. Stone can plausibly argue that these "exigent circumstances render [the action] equivalent to a final denial of petitioner's request." *Pub. Citizen*, 740 F.2d at 32, DE160.

59.     Thus, because the circumstances Plaintiff relied upon "may be proper subject of relief," Plaintiff is entitled to "test his claim[s] on the merits." *Foman*, 371 U.S. at 182.

60.     Regarding finalizing the wife's visa Defendants' counsel communicated to this Court that  there was a link he could go to and initiate setting up final interview. The Court relied on this information and so did the Plaintiff.

61.     The  link  is  located  here:  https://travel.state.gov/content/travel/en/us-visas/ immigrate/the-immigrant-visa-process/step-1-submit-a-petition.html.

62.     To access the link the following information is required: NVC Case Number: TKY2018716001 and Invoice ID Number: IVSCA00000084546.

63.     Exhibit F is a true and correct copy of the link provided above.

64.     After accessing the link it states:

65.     Summary Information

66.     "Fee payments and online forms can no longer be accepted for this case. Previously, the NVC advised you of the necessary steps to prepare for an appointment to file a formal application for an immigrant visa. Our records indicate that to date you have not contacted the NVC in more than a year. If you wish to pursue your immigrant visa application, please contact NVC."

67.     After Defendants counsel provided this link and after this Court relied upon that information Plaintiff repeated tried to access the link. He then repeatedly contacted the  National Visa Center (NVC) and Defendants Department of Justice counsel, and sent numerous emails trying to access the information in the. Link so the final interview could be scheduled.

68.    Plaintiff contacted Defendant counsel no less than twenty-four times trying to get this matter resolved. Plaintiff contacted DOJ counsel via email and telephone and never received a response, not from Defendants, not from the NVC, and not from their counsel.

69.    To quote judge Contreras in his ruling, which set into motion Defendants providing the false link information, the Court held the, "Government's position appears to be that it could indefinitely avoid judicial review of its actions here by postponing a "formal" decision, which strikes the Court as untenable."

70.    What Defendants have done is falsify information, even if not intentionally, which Plaintiff and the Court relied upon and then the link was shut down resulting in further delays in finalizing the matter.

71.    Defendants dangled a false carrots and pulled the rug out from under Plaintiff's feet and pulled the wool over the Court's eyes.

72.    Defendants did this after taking more than 3500.00 USD, including a 1225.00 USD to expedite finalizing the visa matter.

73.    These circumstances clearly create a situation where Defendants are indefinitely avoiding judicial review and is clearly untenable.

74.    Blocking access to the link occurred during a sensitive time where Plaintiff's wife began visiting his child, provided access to his second child, had shows signs of stability, and stated she was willing to restore the family and attend family counseling. Aware of these facts, Defendants blocked access to the link and caused a furtherance of irreparable harm.

75.    At what point does a Court say enough is enough? At what point does a Court stop being a patsy to disingenuous government bad actors, or gross negligence?

76.    This very court through various judges, including Rudolph Contreras, recently issued decisions in visa related cases. Including cases with similar fact patterns. See: Civil Action No. 21-378 (JEB), Civil Action No. 1:20-cv-03192 (CJN), Civil Action No. 21-376 (RC), Case No. 21-cv-00943 (APM), Case No. 21-cv-00999 (APM), and Case No. 21-cv-01530 (APM).

77.    Some of these courts stated Plaintiffs didn't have the right to "move ahead in the cue." Yet, in none of those cases had Plaintiffs paid a 1225.00 USD expedite fee to move ahead in the cue and finalize the visa as Plaintiff had. Apparently these judges were unfamiliar with the fact that money can buy just about anything, even advancing in the cue to get a visa finalized quicker.

78.  Money doesn't seem to be an issue to Defendants, as, when they disgracefully abandoned Kabul they left behind billions of dollars on pallets which U.S. enemies now have at their disposal, just as they had left behind billions of dollars in military equipment, which of course, now China is reverse engineering to improve upon U.S. technology.

79.  Some of that left behind money was used to purchase a 20M mansion in Beverly Hills for the son of the former Afghan Defense Minister, falsely propped up by the Defendants.

80.  In Joseph Brzezinski v. U.S. Department of Homeland Security, judge Contreras addressed Brzezinski's argument that delaying finalizing his fiancé's visa for a year and a half was "unreasonably delayed agency action in violation of the Administrative

81.  Procedure Act ("APA") as well as a violation of due process rights under the Fifth Amendment."

82.  Brzezinski sought finalizing a fiancé visa and had not paid the expedite fee. Plaintiff's wife's "approved" visa is a spouse visa, there are U.S. citizen children involved and Plaintiff paid the expedite fee. As well, nearly five years of time has elapsed and the "approved" visa has not been finalized.

83.  In Brzezinski, Contreras noted, "The next step in the visa process would have been to conduct an interview… at the consulate in Manila and that the time between the last government action and the filing of the complaint was approximately twelve months."

84.  In Brzezinski, the delays were blamed on coronavirus. However, in Plaintiff's case the delays are due Defendants blocking access to a link that was supposed to be accessible to schedule final interview so the wife could get her visa and the family could return to Hawaii. As recently as October of 2021 the wife was interested in finalizing her visa.

85.  Unlike in Brzezinski, Plaintiff has an "actual and concrete" reason to finalize the visa, which includes exigency and where he had paid the expedite fees. See: Sanchez- Gomez, 138. S. Ct. at 1537.

86.  In Brzezinski the court noted, "The next step in the process, after some internal State Department processing, would be for the State Department to conduct an interview with [the fiancé]."

87.  In the present case, after some internal State Department processing the final interview was to be scheduled at the Tokyo Embassy. However, nearly five years has elapsed and the final interview has not been scheduled and the consequential

damages that followed include the wife fleeing to Japan with Plaintiff's child without consent.

88.   Per 5 U.S.C. § 706(1), this Court may "compel agency action unlawfully withheld or unreasonably delayed." Simultaneously, under 28 U.S.C. § 1361, federal courts may issue writs of mandamus to "compel an officer or employee of the United States or any agency thereof to perform a duty owed to the plaintiff." "The standard for undue delay under the Mandamus Act… is identical to the APA standard." *Kangarloo v. Pompeo*, 480 F. Supp. 3d 134, 142 (D.D.C. 2020) (citing *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 63–64 (2004)); *see also Didban v. Pompeo*, 435 F. Supp. 3d 168, 177 (D.D.C. 2020).

89.   In determining whether an agency action has been unreasonably delayed, Plaintiff and the Government appeared to agree in Brzezinski that the Court should apply the six-factor TRAC test established by the D.C. Circuit in *Telecommunications Research & Action Center v. FCC* ("*TRAC*"), 750 F.2d 70 (D.C. Cir. 1984).

90.   The factors of the TRAC test are:

91.   (1) the time agencies take to make decisions must be governed by a rule of reason;

92.   (2) where Congress has provided a timetable or other indication of the speed with which it expects the agency to proceed in the enabling statute, that statutory scheme may supply content for this rule of reason;

93.   (3) delays that might be reasonable in the sphere of economic regulation are less tolerable when human health and welfare are at stake;

94.   (4) the court should consider the effect of expediting delayed action on agency activities of a higher or competing priority;

95.   (5) the court should also take into account the nature and extent of the interests prejudiced by delay; and

96.   (6) the court need not find any impropriety lurking behind agency lassitude in order that agency action is "unreasonably delayed."

97.   According to this Court, "The first factor of the *TRAC* test is the most important and is accordingly weighted more heavily than the rest. *In re Core Communs., Inc.*, 531 F.3d 849, 855 (D.C. Cir. 2008)."

98.   According to judge Contreras the "record [must] contain enough facts to evaluate the TRAC factors" at this stage. *Id.* Certainly, this Court has ample

As well, there has been approximately 300 filings regarding the underlying issues and a myriad of exhibits, declarations and affidavits submitted.

99. In Brzezinski, the Court held the first two TRAC factors weighed in favor of the government because "'There is no congressional imposed timeline' for processing" fiancé visa applications. Mohammad v. Blinken, No. 20-cv-03696, 2021 WL 2866058, at *3 (D.D.C. July 8, 2021) (quoting Bagherian v. Pompeo, 442 F. Supp. 3d 87, 95 (D.D.C. 2020)). "To the contrary, Congress has given the agencies wide discretion in the area of immigration processing." Skalka, 246 F. Supp. 3d at 153– 54. In the absence of a congressionally supplied timeframe, courts typically look to case law for guidance. See Sarlak, 2020 WL 3082018, at *6.

100. Brzezinski pertained to a fiancé visa matter. Plaintiff's wife's visa is a spouse visa and there are two children concerned.

101. Brzezinski's fiancé is from the Philippines where there are many fiancé visas that turn out to be fraudulent. This is not stating Brzezinski's visa application was fraudulent. What is being communicated is Plaintiff's wife is from Japan, a G7 member nation and unlike the Philippines which is one of the poorest nations, Japan is one of the richest nations.

102. In Brzezinski, the delay at issue was approximately eleven months when the complaint was filed and approximately seventeen months at the time the issue was addressed by the Court.

103. As nearly five years of time has elapsed in Plaintiff's wife's visa, that an additional fee was paid to expedite, and that no final interview has been scheduled, and the link provided for such purposes is dead, such facts, such a great amount of time having elapsed is arbitrary and the remedies judge Contreras addressed in Brzezinski should result in the Court compelling Defendants to schedule final interview without further delay.

104. Brzezinski claimed, "there are many courts that have found delays of over one year… to be unreasonable." Those cases found such delays unreasonable to support Brzezinski's contention two years or longer was unreasonable. Id.; see, e.g., Ren v. Mueller, No. 6:07-cv-790, 2008 WL 191010, at 11 (M.D. Fla. Jan. 22, 2008) (holding that the plaintiff adequately alleged that a delay of almost four years was unreasonable under the APA); Gelfer v. Chertoff, No. C 06-06724, 2007 WL 902382, at 2 (N.D. Cal. Mar. 22, 2007) (holding that the reasonableness of a delay of longer than two years was sufficiently fact dependent to survive a motion to dismiss).

105.   In this case, and using the Court's analysis and case law history noted in Brzezinski, the delay in not scheduling final interview and blocking access to a link to schedule final interview, and doing so for nearly five years under the first two TRAC factors weigh heavily in favor of the Plaintiff and not the Defendants. Using Contreras' own analysis, and applicable case law it is clear that a near five year delay is unreasonable and arbitrary.

106.   The Court held in Brzezinski that the "third and fifth TRAC factors weigh at least somewhat in Plaintiff's favor. Although Brzezinski did not appear to explicitly plead how he was harmed by the delay, it is reasonable to infer such harm from the fact that Plaintiff and his fiancé were engaged. *See* Compl. In Brzezinski at ¶ 35.

107.   This Court previously found such circumstances to tilt these factors in favor of a plaintiff. *See Mirbaha v. Pompeo*, 513 F. Supp. 3d 179, 186 (D.D.C. 2021). Though Mirbaha involved a medical childbearing issue that is not at play in the present case, the general diminishment in quality of life tilt these factors in Plaintiff's favor.

108.   There can be no question that the general quality of life has been diminished in Plaintiff's circumstances. Plaintiff went from preparing to take the Hawaii bar exam and offered employment and a judicial assistant at the Hawaii Judiciary to poverty in a foreign country which are circumstances the family had never known. As such the first two TRAC prongs favor Plaintiff strongly and not the Defendants.

109.   Under TRAC 3, the unreasonable delays clearly caused economic harm to Plaintiff, and, the past three years of record show there are clear human health and welfare circumstances at issue, notably the wife's fear that the extensive delays caused her to contact the Japan consulate and report the delays which resulted in the Japan consulate adding fuel to the fire by telling the wife she should return to Japan to avoid being arrested and separated from her child. If this Court read anything Plaintiff provided in his previous filings the Court knows the wife saw women she believed she was similarly situated to being arrested, detained and deported, and ICE was keeping the children behind in the U.S. This parental and human right violating abuse was reported extensively at the time the wife was awaiting for her visa to be finalized.

110.   Under TRAC 5, the court is to take into account the nature and extent of the interests prejudiced by delay. The same analysis as to the wife's state of mind and

the financial damages that followed are strong indicators that TRAC 5 favors Plaintiff.

111.   The Court held in Brzezinski that the "fourth TRAC factor [was] inconclusive. Under TRAC 4, the court must consider the effect expediting the agency action would have on "agency activities of a higher or competing priority." TRAC, 750 F.2d at 80. To this end, the Court will not compel an agency action if doing so would simply move Plaintiff to the head of the line at the expense of others waiting for the same action. *See, e.g.*, *Mirbaha*, 513 F. Supp. 3d at 186; *Skalka*, 246 F. Supp. 3d at 153.

112.   However, Plaintiff paid an expedite fee of 1225.00 USD. Having paid such a fee in 2018 and where it is nearly 2022, no court could reasonably argue delays of more than four years, after paying the expedite fee without finalizing the visa matter does not amount to arbitrary and reasonable delay.

113.   The same analysis applies to the broken link Defendants and their counsel failed to address since this Court issued its DE160 Memorandum and Opinion.

114.   People pay additional fees for better seats at ball games or concerts. People pay additional fees to have better accommodations while on vacation, and on and on.

115.   However, no one expects to pay an additional fee, a very large fee to expedite a matter and have that matter delayed for nearly five years.

116.   Regarding the sixth TRAC factor, in Brzezinski, the government contended that Plaintiff made no allegations of bad faith or impropriety, and argued the sixth TRAC factor should favor the government. However, Contreras held that was a misreading of

117.TRAC 6. The TRAC court held that an allegation of bad faith is unnecessary to find an unreasonable delay. 750 F.2d at 80. In instances where a plaintiff makes no allegation of bad faith, courts have chosen not to apply the sixth TRAC factor at all, *see, e.g.*, *Mirbaha*, 513 F. Supp. 3d at 186, or acknowledged the sixth factor does not count against the plaintiff's case, *see Ghadami*, 2020 WL 1308376, at *9. Accordingly, the sixth factor did not affect the outcome in Brzezinski and shouldn't factor in this case as well.

118.   For the foregoing reasons, Defendants' failure to schedule final interview by blocking access to the link provided July 25th 2020, while given ample opportunity to remedy the deficiency, yet taking no action to do so after numerous contacts notifying such amounts to arbitrarily delaying final agency action to avoid judicial review, which this Court already ruled was untenable. As such this Court must compel Defendant to schedule Plaintiff's wife's final interview. This

communicating with Plaintiff again and provide access to his currently abducted children.

III.

Consular Report of Birth Abroad and Social Security Card Issuance

119.　In this Court's DE160 this Court held "Plaintiff is entitled to "test his claim[s] on the merits." *Foman*, 371 U.S. at 182. Given that Plaintiff's request to include a Motion to Compel U.S. Citizenship for his second-born child is not futile."

120.　As this Court was preparing to its DE160 ruling, Defendants suddenly issued a December 19th 2019 deadline for Plaintiff's child to personally appear at the embassy to receive CRBA and Social Security Card.

121.　Defendants and this Court are aware Plaintiff's wife refused to take the child to the scheduled interview. The wife would not take the child to the embassy because she fears once she entered the embassy she would be arrested and extradited due abducting Plaintiff's firstborn child into Japan.

122.　Plaintiff paid the fee, scheduled appointment and gave the child's mother 20,000 yen (200.00 USD) so the child could appear at the interview. Even so, the child was not taken to the interview for CRBA and Social Security Card.

123.　Defendants refused to waive appearance of the child even during the pandemic, where Japanese authorities refused anyone in Japan to travel to Tokyo, under penalty of arrest. The demand for a toddler to make an appearance under such circumstances is unreasonable.

124.　This Court also recognized the "unfairness" where Japan's Hague Convention Central Authorities failed to issue a return order. As well, it is equally unfair that Plaintiff's child is caught up in the mother's fear and equally unfair that the child would not receive as his birthright, proof of being a U.S. citizen because the adult that has control over the child refuses to take the child to the embassy to obtain CRBA and Social Security number.

125.　January 15th 2021, Defendants denied issuance of CRBA and Social Security Card due the child not appearing at the embassy. Plaintiff would like nothing more than to appear at the embassy with child, but that matter is out of his control.

126.　Exhibit G are true and correct copies of relevant documents Defendants provided Plaintiff. One exhibit shows waiver is permitted, yet waiver is being denied. Another exhibit shows the deadline for the child to appear and another exhibit shows an arbitrary deadline was set by Defendants, that it has passed and issuance of CRBA and Social Security number denied.

127.   Defendants may waive appearance, but refuses to do so. The question remains, will the child never receive his citizenship documents and the benefits that follow where an appearance can assuredly be waived under the known circumstances that are out of Plaintiff's control. Balancing Defendants demand the child personally appear, where the child can barely walk or speak. For what purpose does the child have to appear? To be looked at? For a consulate to aid in changing a diaper or feed the child when he's hungry?

128.   In balancing the interest of the child making an arbitrary personal appearance, or not get his birthright proof of citizenship documents, the scale weighs greatly in favor of the child receiving his CRBA and Social Security number. Moreover, without issuance of Social Security number the child will lose more than 6900.00 USD in Cares Act benefits. This too tips the scale in favor of the child's personal appearance being waived.

129.   Finally, the fact that waiver itself exists for a child to receive CRBA and Social Security number is all that should be required for the Court to order waiver and issuance of said documents so long as Plaintiff repays the application fee of 100.00 USD, and provides the same document as evidence that Plaintiff provided when his firstborn child received his CRBA and Social Security number.

130.   The fact is, the identical documents had already been submitted for both children and aside from the personal appearance, the firstborn child received said documents without issue.

## Conclusion

For the foregoing Plaintiff's child's personal appearance should be waived and the child's CRBA and Social Security number issued so long as Plaintiff provides the required documentary proof the child satisfies citizenship under INA 300-301.

Submitted,

November 17th 2021

Jack Stone
6-19-10 Fukumuro
P-Building, 2-507
Miyagino, Miyagi
Japan 983-0005
Email: mail@stackjones.com

## CERTIFICATE OF SERVICE

I hereby certify that on November 17th 2021, I served a copy of this filing via CM/ECF to Defendants' counsel or record.

/s/ Jack Stone

# EXHIBIT A.

Jack Stone

I don't live in Vancouver, so please don't come to Vancouver

I will raise my two sons

If you want to contact me, please send a letter to
my parent's house

Miyuki Suzuki

# EXHIBIT B.



# EXHIBIT C.



TRAVEL.STATE.GOV
A SERVICE OF THE BUREAU OF CONSULAR AFFAIRS
U.S. Department of State

U.S. Embassy Tokyo 1-10-5 Akasaka, Minato-ku, Tokyo
The Embassy does NOT store laptops or large luggage. For Consular Report of Birth (electronic application), please allow 5 working days between payment submission and interview appointment time.

ACS Appointment System –

**APPOINTMENT DETAILS**

PLEASE PRINT THIS PAGE AND BRING IT WITH YOU WHEN YOU APPEAR AT THE EMBASSY OR CONSULATE.

| | |
|---|---|
| **Date of Appointment:** | **Monday, November 15, 2021** |
| **Time of Appointment:** | **1:15:00 PM** |
| **Appointment UID:** | PA29336310 |
| **Appointment Password:** | Svw91lbPee |
| **Applicant's Surname:** | STONE |
| **Applicant's Given Name:** | MASAYUKI |
| **Applicant's DOB (dd/mmm/yyyy):** | 04-JAN-14 |
| **Contact Telephone Number:** | N/A |
| **E-mail Address:** | STACK.JONES@MAIL.COM |
| **Name of non-applicant who will be appearing for this appointment:** | JACK STONE N/A |
| **Number Of Services Required:** | 1 |
| **Type Of Services Required:** | Passport services other than adding pages. |

**IMPORTANT:**

1. Please read all the instructions and complete all forms for the service you have requested. Failure to submit a complete and correct application will delay your case. To minimize the time you will need to spend at the Embassy or Consulate on the day of your appointment, please fill in application forms prior to arrival.
2. If you need to make another appointment for someone else, please click here.
3. If your plans change, please click here to cancel your appointment prior to the date you are scheduled to appear. You must first cancel your existing appointment in order to make a new one.

Sent: Friday, November 05, 2021 at 4:54 PM

From: "U.S. Embassy Tokyo ACS" <TOKYOACS@state.gov>

To: "Stack Jones" <stack.jones@mail.com>

Cc: "U.S. Embassy Tokyo ACS" <TOKYOACS@state.gov>

Subject: RE: Jack Stone v. U.S. Dept. of State: Case No. 19-3273

Mr. Stone,

Thank you for your email and we apologize for the delay.

Per the information available on our website (https://jp.usembassy.gov/passports/children-under-16-first-time-and-renewal/), applicants must appear in person, accompanied by both parents. Appointments are required.

Please bring all necessary documents to your appointment. We cannot accept incomplete applications. Children under age 16 cannot apply for a passport by themselves. Both parents or guardians must authorize the issuance of the child's passport. The best way to do this is for both parents or guardians to go with the child in person to apply for the passport.

As previously discussed, you may wish to seek legal advice from an attorney in Japan for information on custody issues and domestic abduction issues.

Sincerely,

American Citizen Services

U.S. Embassy Tokyo

# EXHIBIT D.





# EXHIBIT E.

**Sent:** Monday, November 15, 2021 at 1:00 PM
**From:** "U.S. Embassy Tokyo ACS" <TOKYOACS@state.gov>
**To:** "Stack Jones" <stack.jones@mail.com>
**Subject:** RE: Update

Mr. Stone,

Thank you for providing the update.  We will attempt to schedule a welfare check with the children.

Sincerely,

American Citizen Services

U.S. Embassy Tokyo

**Sent:** Thursday, November 11, 2021 at 11:47 AM
**From:** "宇部雄介" <yusuke.ube@gmail.com>
**To:** "Stack Jones" <stack.jones@mail.com>
**Cc:** "HIROKI KOIKE" <koike@sendai.law>
**Subject:** Up Date211111

Dear Mr. Jack Stone

Thank you for sending emails.

Yesterday I did the following.

昨日、私は、以下のことをしました。

1   I called Miyuki Suzuki's parents' house.

I talked to her mother.
Miyuki Suzuki and your children are not at Miyuki 's parents' homes.
Her mother said she couldn't get in touch with Miyuki.

鈴木ミユキさんの両親の家に電話をしました。
彼女の母親と話をしました。
鈴木ミユキさんと子供達は、両親の家には、いないそうです。
母親は、鈴木ミユキさんと連絡がつかないとのことです。

2   I called Miyuki Suzuki's cell phone. She does not answer.

鈴木ミユキさんの携帯電話に電話をしました。彼女は、電話にでませんでした。

3   I contacted Mr. Kinoshita Suzuki's former Lawyer.

He, said he did not know the ending of the family court matter because he resigned representing Miyuki.

木下弁護士に連絡してみました。
彼も、途中で辞任したので、結末は知らないと話していました。

4   The current family register is required to file the procedure.

What you emailed me is from 2019.
I need the registration from November 2021.

I have asked Yonezawa City to issue a current family register.

あなたがメールしてくれたものは、２０１９年時点のものです。
私は、２０２１年１１月のものが必要です。

今、米沢市に、戸籍の取り寄せを求めています。

I will file written application with the family court after family register arrives from Yonezawa City.

米沢市から、戸籍が届いた後、家庭裁判所に申し立てをしたいと考えています。

Best regards

Yusuke Ube

---------------------------------------------------------
〒９８０－０８０３
仙台市青葉区国分町一丁目３番２０号
肴町ビル２階　仙台中央法律事務所
　　　弁護士　宇　部　雄　介
　電　話　０２２－２２７－２２９１
　ＦＡＸ　０２２－２２７－２２９４
　メール　yusuke.ube@gmail.com
ホームページ　http://www.s-chuho.com/
---------------------------------------------------------

# EXHIBIT F.



# EXHIBIT G.



***Embassy of the United States of America***

1-10-5 Akasaka Minato-ku, Tokyo, Japan

Date:  January 5, 2021

VIA Email:  mail@stackjones.com

Mr. Jack Stone
2-2-15-101 Tsunogoro Aoba
Miyagi, Japan 980-0874

Dear Mr. Stone:

This letter is to notify you that the application for a Consular Report of Birth Abroad (CRBA) for Sky Stone has been denied.  By letter of September 18, 2020, we requested you  to appear in person with Sky to execute the application and to be interviewed.  We informed you in the same letter that if you did not comply within 90 days, Sky's application for a CRBA would be denied.  It has been more than 90 days and you have not appeared in person as requested with Sky.  Sky's CRBA application is denied for failure to submit the required evidence under  22 C.F.R. § 51.45 as made applicable by 22 C.F.R. § 50.5.

CRBA application fees are non-refundable.  If you still wish to apply for a CRBA for Sky, you may submit a new application but must pay all appropriate fees, provide all required evidence and documentation, and make an appointment to appear for interview at the U.S. Embassy with Sky.

Sincerely,

Consul
American Citizen Services



*Embassy of the United States of America*
*Tokyo, Japan*

26 October 2020

Dear Mr. Stone:

The U.S. Embassy Tokyo is in receipt of your communication on October 14, 2020, a court filing entitled "Plaintiff's Infant Child's U.S. Tokyo Appearance Required". To the extent this document is a request for a waiver of personal appearance for you and/or your minor child, S.S., at the U.S. Embassy Tokyo to complete your CRBA application on behalf of S.S., your request is denied. Personal appearance exceptions for minor children for whom parents are seeking CRBAs are exceedingly rare, and the information you have provided to us regarding your situation does not meet the criteria. The U.S. Embassy Tokyo is open and providing regular consular services. If you wish to wait until the COVID-19 pandemic has subsided to complete the necessary steps to execute a CRBA application, you are free to execute a new application when you and/or your wife are prepared to appear in person with your child.

Regarding your request to clarify the documents necessary to confirm identity and citizenship of your child, you received a list of documents and evidence to bring to the U.S. Embassy when you appear in person with your appointment confirmation; however, each case is evaluated individually, and more evidence may be required depending on the information we receive when you and your child appear in person. We are unable to anticipate what additional evidence may be required to evaluate your child's case until the child appears in person with at least one parent.

With regard to your specific request that the U.S. Embassy Tokyo engage the local police to forcibly remove your minor child from your wife's custody in order to bring the child to the U.S. Embassy to complete the execution of the CRBA application you submitted on his behalf. The U.S. Embassy Tokyo does not engage law enforcement in this manner on behalf of a private party seeking to document a child's U.S. citizenship. Whoever informed you that we could assist you in that way was mistaken.

If you believe your child is in danger, or you are seeking sole custody of your child, we recommend you contact a local attorney, the local police, or other Japanese authorities. The U.S. Department of State does not adjudicate custody, and does not intervene in private disputes between parents over custody. As we noted previously, if you prefer that we adjudicate your pending application based on the information we have already received, please confirm that in writing to TokyoPPT@state.gov; otherwise we will continue to await your and your child's appearance at the U.S. Embassy Tokyo by appointment. Thank you for contacting the Department of State.

Sincerely

American Citizen Services Unit – Tokyo, Japan

SBU - LEGAL

Dear Mr. Stone:

We are contacting you regarding the incomplete Consular Report of Birth Abroad application you submitted online via the U.S. Embassy Tokyo eCRBA system on **December 19, 2019** for **Sky Stone, a minor.** As stated on the U.S. Embassy Tokyo's website, *see* https://jp.usembassy.gov/u-s-citizen-services/child-family-matters/birth/online-crba-eligibility/online-crba-faq/, and in the December 19, 2019 confirmation message you received by email, there are still several steps you need to take to complete the application process.

The remaining steps are:

1. Make an appointment for you and/or the child's other parent to appear, in person, at the U.S. Embassy in Tokyo;
2. At least one parent appear in person with Sky Stone; and
3. Provide documents sufficient to establish Sky Stone's identity and citizenship, as described on the website referenced above.

While in some extreme circumstances the appearance of a minor child on whose behalf a Consular Report of Birth Abroad is sought may be waived, in this case Sky Stone's appearance at the U.S. Embassy in Tokyo is required to confirm identity and citizenship.

Please note that if you do not make an appointment and appear at the U.S. Embassy within 90 calendar days of this letter, *i.e.*, Thursday, December 18, or if the information we receive is insufficient to establish Sky's entitlement to a Consular Report of Birth Abroad in accordance with 22 C.F.R. §§ 50.5 and 50.7, Sky's application will be denied and your evidence will be returned to you.  If, at any point in the future, you wish to apply again, you will need to execute a new application, submit all requested evidence, and pay a new fee.  An appointment can be scheduled on the Embassy website, https://evisaforms.state.gov/acs/default.asp?postcode=TKY&appcode=1, or via email to TokyoPPT@state.gov if the appointment calendar is full.

If you seek a final determination on the pending application in advance of Thursday, December 18 without taking the above listed steps, please let us know in writing at **TokyoPPT@state.gov.**  The Department will make a final decision based on the information already provided to and obtained by the Department.

To: Clerk

This is a new filing. There is a related
case, no res judicata, due no final agency
action at time of filing.

Jerle Stee        (emergency filing due
                   reabduction of my two
                   children in a foreign county.